[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 877 
Lillian Olsen and her husband Richard Olsen sued the defendants, Gary M. Rich, M.D.; Susan Bowden, R.N.; and Providence Hospital, alleging that they had negligently provided Lillian Olsen with medical care and treatment. The jury rendered a verdict for the defendants. The Olsens moved for a new trial, arguing that the trial court had erred in overruling their objection to the composition of the jury, based on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), and had erred in allowing the defendants' expert to testify as a "similarly situated health care provider." The trial court denied the new trial motion. The Olsens appeal from the resulting judgment for the defendants.
On December 19, 1989, Mrs. Olsen had an allergic reaction to medication given to her during a diagnostic heart catheterization procedure that was administered at Providence Hospital by Dr. Gary M. Rich. Before this incident, Mrs. Olsen had had numerous medical problems, and she had a history of allergic reactions to medications. Dr. Rich had treated her since 1987, and he knew that she had several allergies. However, Mrs. Olsen's medical history gave no indication that she would have an allergic reaction to the medication received during the catheterization procedure.
On December 19, after being properly prepared, Mrs. Olsen was taken to the catherization lab, and the procedure was started at 10:01 a.m. One of the nurses involved with the procedure placed a Hep-lock device in Mrs. Olsen's right arm for the purpose of administering medications during the catheterization procedure. Before the actual catheterization, the nurses administered four separate doses of Versed, which, according to expert testimony, is a medication routinely given to patients during such procedures to relieve anxiety and cause the patients to experience what is called "conscious sedation." Phenergan, a medication for nausea, was also administered to Mrs. Olsen through the Hep-lock device.
Dr. Rich inserted the diagnostic catheter into the femoral artery, and more medication was administered through the Hep-lock device to prevent blood clotting. He performed the diagnostic heart examination by standing near Mrs. Olsen's head and taking X-rays. Mrs. Olsen's only pain was in her right hand and her right arm, where she was receiving the medication. The plaintiffs alleged no negligence regarding the actual heart catheterization procedure.
According to the Dr. Rich's notes, Mrs. Olsen first complained of pain in her right *Page 878 
hand at approximately 11:01 a.m. This complaint of pain is the critical point of Mrs. Olsen's allegation of negligence. She alleged that she complained of pain to the nurses with each administration of the Versed, and she argues that her complaints, in effect, placed the defendants on notice that there was a problem. She alleged that the nurses and Dr. Rich failed to properly place the Hep-lock device into her vein and that they failed to administer the proper medical care. The plaintiffs contend that as a result of the failures of care in this regard, Mrs. Olsen has suffered permanent injuries. However, there was considerable inconsistency in Mrs. Olsen's testimony. Specifically, Mrs. Olsen once said that she never spoke to the nurses of her pain, but she changed this testimony at trial. The issue was submitted to the jury, and the jury found for the defendants.
On appeal, the Olsens argue (1) that the trial court erred in finding that the defendants' use of their peremptory strikes was not racially motivated; and (2) that the trial court erred in allowing Dr. William R. Higgs to testify for the defendant physician regarding the breach of the applicable standard of care.
 I. The Batson Issue
After the trial court reduced the venire to a panel of 30 members, 6 of the veniremembers were black. The defendants jointly used 5 of their 9 peremptory strikes to remove black veniremembers. Before the jury was sworn in, the plaintiffs made their Batson objection. Although the trial court did not expressly find that the Olsens had established a prima facie case under the guidelines of Ex parte Branch, 526 So.2d 609,625 (Ala. 1987), it requested the defendants to articulate their reasons for striking each potential black juror. After they did so, the trial court overruled the Batson objection.
We first note that the party alleging discriminatory use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. When the prima facie case is established, the burden shifts to the responding party, who must articulate clear, specific, and legitimate reasons for the peremptory challenges. The reasons stated must relate to the particular case, and the reasons must be nondiscriminatory. After race-neutral reasons are articulated, the moving party can offer evidence showing that the reasons or explanations given constitute merely a sham or pretext. Finally, the trial court's ruling on the question whether the responding party offered legitimate race-neutral reasons will not be overturned unless it was clearly erroneous. K.S. v. Carr, 618 So.2d 707,710 (Ala. 1993), citing Ex parte Branch, 526 So.2d 609, 622
(Ala. 1987), and Ex parte Bird, 594 So.2d 676, 679 (Ala. 1991).
We will address separately the defendants' reasons for the five challenged preemptory strikes that removed black veniremembers.
Counsel for the defendants stated that veniremember number 9, R.T., was struck because he was disabled, was the same age as Mrs. Olsen, and did not respond or react well to several questions posed by defense counsel. The plaintiffs argue that there were white veniremembers who were the same age as Mrs. Olsen, but whom the defendants did not strike. However, defense counsel made it clear that the primary reason for striking R.T. was that he was disabled and the defendants feared that a disabled juror would unduly sympathize with the plaintiff.
When determining whether a proffered explanation is a sham or pretext, the court may consider whether "persons with the same or similar characteristics as the challenged juror were not struck." Branch, supra, 526 So.2d at 624. The record indicates that R.T. was the only veniremember — white or black — with a disability. Therefore, the trial court's determination that R.T. was struck for a race-neutral reason was not clearly erroneous.
Defense counsel said that veniremember number 18, D.M., was struck because during voir dire he stated the following:
 "I would have a problem based on, you know, if they are talking about cutting, and the injection of the needles and stuff like that. I would have a problem there. Because, you know, I don't like going to a *Page 879 
doctor myself, you know. But if that's part of it, I would have a problem with that."
This case was about blood and needles. D.M.'s statement sufficiently indicates such a concern about the procedures to be discussed at the trial to support the defendant's contention that D.M. was not struck because of race. Therefore, the finding that this reason was race-neutral was not clearly erroneous.
Defense counsel explained that they struck veniremember number 3, R.B., because she was unemployed and because of her demeanor during certain questions. Specifically, defense counsel stated that R.B. reacted badly to questions regarding the jurors' making a commitment. He explained that R.B. would not nod with the other jurors when asked to make commitments about different aspects of the trial. We note, first, that the defense also struck a white veniremember solely because she was unemployed. Second, we note that the main reason articulated by defense counsel for striking R.B. was her demeanor. This Court has recognized that demeanor, indicating such things as hostility or inattentiveness, is a race-neutral reason for a peremptory strike. Jelks v. Caputo, 607 So.2d 177 (Ala. 1992).Bell v. Lowery, 619 So.2d 1380 (Ala. 1993). That reason has been explained as follows:
 "It is well to note that feelings are not always expressed in words, and, indeed, may be clearly manifested by gestures and facial expressions. A grimace or stare may express hostility or displeasure quite as clearly as words shouted across a room."
Reynolds v. Benefield, 931 F.2d 506, 512 (8th Cir. 1991). The trial court's ruling with respect to the strike of R.B. was not clear error.
Defense counsel stated that the reason for striking veniremembers number 33, B.C., and number 28, V.N., was that they were both young and had unskilled, lower-pay jobs. The defense further explained that the plaintiffs had three daughters and two nieces who were scheduled to testify during the trial, and that all five of these young women were the age of B.C. and V.N. and also had unskilled, lower-pay jobs. These five witnesses were to testify regarding Mrs. Olsen's pain and how they had cared for her. Therefore, defense counsel explained, B.C. and V.N. could identify with these witnesses for the plaintiffs. The plaintiffs argue that the defense failed to strike an unskilled white veniremember. However, defense counsel made it clear that B.C. and V.N. were struck because of the combination of the fact that they were unskilledand were relatively young. No white veniremembers were both young and unskilled, like B.C. and V.N. Factors such as age and employment are accepted as legitimate reasons for peremptory strikes where those factors, under the circumstances of the case, might make the potential jurors sympathetic to, or able to more easily identify with, a particular party. Jelks v.Caputo, 607 So.2d 177 (Ala. 1992). Stephens v. State,580 So.2d 11 (Ala.Cr.App. 1990). We conclude that the trial court's determination that B.C. and V.N. were struck for race-neutral reasons was not clearly erroneous.
 II. The Defendants' Expert Witness
The plaintiffs objected to the testimony of Dr. William R. Higgs, an expert proffered by the defendants, on the grounds that he did not qualify as a "similarly situated health care provider" within the meaning of the Alabama Medical Liability Act of 1987. The plaintiffs, citing Ala. Code 1975, §6-5-548(c), contend that because Dr. Rich is a board certified cardiologist, Dr. Higgs also must be a board certified cardiologist in order to testify regarding the standard of care.
The Alabama Medical Liability Act of 1987, Ala. Code 1975, § 6-5-540 et seq., governs this action against Dr. Rich, because he is a "health care provider" as defined in §6-5-481(8) and § 6-5-542(1). Dowdy v. Lewis, 612 So.2d 1149
(Ala. 1992). Under § 6-5-481(8), in order to hold Dr. Rich liable for Mrs. Olsen's injuries, the plaintiffs must prove by substantial evidence that Dr. Rich failed to exercise such reasonable care, skill, and diligence as other "similarly situated health care providers" in the same general line of practice ordinarily have and exercise in a like case. Dowdy, 612 So.2d at 1151. *Page 880 
In Medlin v. Crosby, 583 So.2d 1290 (Ala. 1991), this Court stated:
 "Our interpretation of the statute leads us to conclude that the trial court must answer three questions before deciding whether a proffered expert witness qualifies as a 'similarly situated health care provider' within the meaning of the statute: (1) What is the standard of care alleged to have been breached? (2) Is the defendant 'health care provider' a specialist in the discipline or school or practice of the standard of care that the court has previously determined is alleged to have been breached? (3) Does the proffered expert witness qualify as a 'similarly situated health care provider' under the subsection determined in the second step to apply?"
This three-question test requires that the trial court first determine the field of medical practice in which the negligence is alleged to have occurred, in order to properly classify the defendant "health care provider" as a specialist or as one who is not a specialist. If the defendant "health care provider" is a specialist, then § 6-5-548(c) will dictate what requirements the proffered expert witness must meet before testifying regarding whether the defendant breached the standard of care. However, if the defendant "health care provider" is not a specialist, then the witness must meet the requirements of §6-5-548(b).
Therefore, we first determine what standard of care applies in this case. The plaintiffs allege that Dr. Rich failed to appropriately assess Mrs. Olsen's complaints of pain, inspect the injection site, and discontinue the medications. Specifically, the plaintiffs alleged that the Hep-lock device was negligently placed into an artery, so that it provided what is called an intra-arterial injection, instead of being placed into a vein. The plaintiffs argue that this placement constituted negligence; that this negligence caused Mrs. Olsen tremendous pain; that Dr. Rich and his assisting nurses failed to identify the swelling and redness around the injection; and that they failed to correctly respond to her complaints of pain during the administration of the medications.
The plaintiffs objected to the following testimony by Dr. Higgs regarding the injury to Mrs. Olsen's hand:
 "Q: Doctor, if this had been an intra-arterial injection, would we have seen this result?
"A: No.
 "Q: When the pressure was relieved, the circulation returned; correct?
 "A: That's correct. That's how that tourniquet works.
 "Q: Doctor, in your practice you are familiar with the use of Hep-locks and IVs; correct?
"A: Yes.
 "Q: Doctor, I want you to assume that Mrs. Olsen complained of right-hand pain as reflected in the record at 11:01. Do you have an opinion as to whether Dr. Rich was acting within the standard of care in having a nurse check the IV site at that time?"
R.T. at 431.
At this point the plaintiffs' counsel objected to Dr. Higgs's testifying regarding the standard of care, pointing out that Dr. Higgs was not a board certified cardiologist. Defense counsel argued to the trial judge that Dr. Higgs's testimony regarded Hep-lock devices and IVs, which counsel argued were directly within the field of Dr. Higgs's particular specialties. The trial court admitted the testimony regarding Dr. Rich's standard of care regarding the Hep-lock device and the IV site. It is important to note that the plaintiffs did not allege negligence regarding the actual catheterization procedure and that Dr. Higgs did not attempt to testify regarding the standard of care applicable to a heart catheterization. Therefore, we conclude that the standard of care applicable in this case is that of a "health care provider" intravenously administering medications during a medical procedure. Medlin v. Crosby, supra.
Having determined the standard of care to be applied, we must determine whether the defendant "health care provider," Dr. Rich, is a specialist, in the practice of intravenous administration of medications (see § 6-5-548(c)) or is not a specialist (see *Page 881 
§ 6-5-548(b)). This Court has held that a defendant health care provider, to be a "specialist," must meet all three of the requirements in subsection (c): (1) board certification as a specialist in the medical field involved in the case; (2) training and experience in that field; and (3) holding himself out as a specialist in that field. Medlin, 583 So.2d at 1296.
It is clear that Dr. Rich meets all the requirements in subsection (c) to qualify as a cardiac specialist. Dr. Rich is a board certified cardiologist, he did a cardiology residency at hospitals affiliated with Emory University, and he has been practicing in the field of cardiology since 1975. Presently, Dr. Rich practices with five other doctors at the Mobile Heart Center as a cardiologist, and he performs an estimated 500 heart catheterizations a year. He is also a member of the American College of Cardiology. Therefore, if the alleged negligence had occurred in the actual catheterization procedure, it is clear that § 6-5-548(c) would apply. However, cardiology is not the medical field in which the negligence is alleged to have occurred. As explained above, the alleged breach of the standard of care occurred while Dr. Rich wasintravenously administering medication. This Court has held that, "for purposes of determining whether a 'health care provider' is a 'specialist,' . . . the trial court should look to whether the defendant 'health care provider' is board certified in the specialty or discipline or school of practice that covers the area of the alleged breach." Medlin, 583 So.2d at 1294 (emphasis added). See also Rodgers v. Adams,657 So.2d 838 (Ala. 1995).
The appropriate focus is on whether Dr. Rich is board certified in the area of the alleged breach. Dr. Rich is not board certified in pulmonary or vascular medicine, which would specifically include intravenous injections and injury to veins, arteries, or blood vessels. Because all three requirements of subsection (c) are not met, we must conclude that in this case Dr. Rich is not to be considered a "specialist" for the purposes of § 6-5-548(c).
Because in the practice out of which the negligence is alleged to have arisen, Dr. Rich was not acting as a "specialist" within the meaning of § 6-5-548(c), the question whether the expert proffered to testify as to Dr. Higgs's standard of care is a "similarly situated health care provider" must be determined by applying § 6-5-548(b).
Section 6-5-548(b) defines a "similarly situated health care provider" as one who:
 "(1) Is licensed by the appropriate regulatory board or agency of this or some other state; and
 "(2) Is trained and experienced in the same discipline or school of practice; and
 "(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard occurred."
Dr. Higgs, the health care provider permitted to testify on behalf of the defendants, is a vascular, cardiac, pulmonary, and esophageal surgeon. He graduated from Louisiana Tech University with a degree in zoology and chemistry. He then received a medical degree from Baylor College of Medicine. Dr. Higgs did his internship at a Memphis hospital and served residencies in Houston and Atlanta. His residencies were in general and vascular surgery, and in pulmonary work. He is on the staff of Mobile Infirmary, Providence Hospital, and Springhill Hospital, and is on the consulting staff at the University of South Alabama Hospital. Dr. Higgs has been a clinical professor of surgery at the University of South Alabama since 1976. He has been in private practice with three other doctors since 1976. Dr. Higgs testified that in his medical practice his speciality consisted of conducting vascular, cardiac, pulmonary, and esophageal surgery, and he testified that he occasionally puts in pacemakers. He testified that doing vascular surgeries required working with injuries to, and/or complications with, veins, arteries, and blood vessels.
Dr. Higgs further testified that the cardiac medical treatment and/or surgeries that he conducts are often performed in response to cardiac catheterization results. Dr. Higgs explained that because his speciality was working with veins, arteries, and blood vessels, he was often called upon for assistance *Page 882 
or advice during catheterization procedures. He stated that he was in catheterization labs "frequently." As mentioned earlier, dealing with Hep-lock devices and IV sites is an integral part of Dr. Higgs's daily practice. He testified that on the the day before the trial he had treated a patient with the exact complications as Mrs. Olsen. The record indicates that Dr. Rich sought Dr. Higgs's medical advice after realizing that Mrs. Olsen's right arm and hand had been injured during the heart catheterization procedure.
Dr. Higgs is at least as qualified in the area of the alleged negligence as Dr. Rich, the defendant "health care provider." Accordingly, Dr. Higgs met the § 6-5-548(b) definition of a "similarly situated health care provider." The trial court properly allowed Dr. Higgs to testify.
AFFIRMED.
MADDOX, ALMON, SHORES, KENNEDY, INGRAM and BUTTS, JJ., concur.
COOK, J., concurs in the result.