[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1342 
Dr. Thomas R. Dempsey appeals from a judgment based upon a jury verdict in favor of James Phelps and his wife Cynthia Phelps, as the parents of James Phelps, Jr. The Phelpses alleged that Dr. Dempsey had failed to provide proper treatment for their son following surgery to correct a clubfoot condition. Following Dr. Dempsey's treatment, portions of the son's foot had to be amputated. The jury returned a verdict of $270,000, and the trial court entered a judgment on that verdict. This was the second trial of this case. After the first trial, this Court reversed a judgment in Dr. Dempsey's favor, see Phelps v. Dempsey, 656 So.2d 377 (Ala. 1995), because the trial court had erred in failing to admit evidence of certain tests that had been performed on the child's foot. We affirm the judgment entered following the second trial.
A jury's verdict is presumed correct and will not be disturbed unless it is plainly erroneous or manifestly unjust.Crown Life Insurance Co. v. Smith, 657 So.2d 821 (Ala. 1994). In addition, a judgment based upon a jury verdict and sustained by the denial of a postjudgment motion for a new trial will not be reversed unless it is plainly and palpably wrong. NationalSecurity Ins. Co. v. Donaldson, 664 So.2d 871 (Ala. 1995). Because the jury returned a verdict for the Phelpses, any disputed questions of fact must be resolved in their favor, and we must presume that the jury drew from the facts any reasonable inferences necessary to support its verdict. StateFarm Auto. Ins. Co. v. Morris, 612 So.2d 440, 443 (Ala. 1993). In short, in reviewing a judgment based upon a jury verdict, this Court must review the record in a light most favorable to the appellee. Liberty National Life Ins. Co. v. McAllister,675 So.2d 1292 (Ala. 1995).
The facts of this case were thoroughly set forth in our opinion on the first appeal of this case. For the reader's convenience, the following facts are recited here as excerpted from that opinion: *Page 1343 
 "James, Jr., was born with spina bifida. It was eventually also determined that his right foot was a clubfoot. The foot condition worsened as the child grew older, and it required corrective surgery when he was two years old.
 "Dr. Dempsey performed the foot surgery on June 30, 1987, and James, Jr., was released from the hospital the following day. The child's right foot was enclosed in a cast that extended the full length of his leg. On July 2, the Phelpses noted that the toes of the child's right foot had turned a dark red; the toes continued to darken in color until on Saturday, July 4, the Phelpses noted that the big toe on that foot had a dark purple color and that the second and third toes were lighter purple. They also noted that the child had a slight fever. The Phelpses attempted to contact Dr. Dempsey that day through his answering service, but were unable to. The child's condition worsened and on July 5 they again attempted to contact Dr. Dempsey through his answering service; they were instructed to bring the child to Dr. Dempsey's office the next morning.
 "On July 6, the child's condition had worsened, his big toe was nearly black, and the second and third toes were dark purple. Dr. Dempsey cut a small hole in the cast to observe the condition of the foot and concluded that the child had 'cast blisters' on the foot. The child's condition worsened the next day, July 7; his fever persisted, his toes were darker, and pus was draining from his foot. Although Mrs. Phelps returned the child to Dr. Dempsey, the doctor simply informed her that the cast blisters had broken and were draining. Mrs. Phelps returned James, Jr., to Dr. Dempsey on July 8. He instructed her to take the child to his pediatrician to be evaluated for an ear or respiratory infection.
 "On July 9, Mrs. Phelps took James, Jr., to Dr. Van Chunn, his pediatrician. Dr. Chunn noted the child's fever and the blackened color of all his toes; he prescribed an antibiotic, even though he found no ear or respiratory infection. He also sent James, Jr., for an X-ray of his right foot. Mrs. Phelps returned James, Jr., to Dr. Chunn on July 10. Dr. Chunn advised her that the child's condition had to be caused by something occurring beneath the cast, but that the X-ray did not show the foot well enough to indicate the cause, and instructed her to return the child to Dr. Dempsey.
 "On the morning of July 11, the condition of the child's foot had worsened and the big toe was completely black. Mrs. Phelps telephoned Dr. Dempsey and informed him that she and her husband were taking James, Jr., to the emergency room at Springhill Memorial Hospital. Dr. Dempsey met the Phelpses at the hospital and, at the insistence of Mr. Phelps, removed the cast from the child's foot and leg. Dr. Dempsey had informed them that removing the cast could upset the surgical procedure that had been performed to correct the child's clubfoot condition. Removal of the cast revealed that the foot was swollen and blackened and was draining pus. Dr. Dempsey bandaged the foot and told the Phelpses to bring James, Jr., to his office the next morning.
 "On the morning of July 12, Dr. Dempsey cleaned and rebandaged the child's foot and gave them an antibiotic used to treat skin infections. He told the Phelpses that James, Jr., had some dead skin and instructed them to clean and bandage his foot several times daily. During the following week, the child's fever decreased, but the condition of his foot did not improve.
 "On July 17, the child's fever returned and, on July 18, his parents took him to the Mobile Infirmary emergency room, where they were met by Dr. Chunn. Dr. Chunn admitted James, Jr., and put him on an intravenous antibiotic. He also ordered a test of a culture from the surgical wound on the child's foot; that test was positive for staphylococcus bacteria. Over the next several days, the child's condition improved somewhat and, on July 24, Dr. Dempsey discharged him from the hospital and placed him on the same antibiotic he had prescribed earlier.
 "On August 1, Mrs. Phelps discovered a great deal of 'black stuff' while changing *Page 1344 
the bandages on the child's foot. She took him to Dr. Dempsey, who informed her that the child needed to see a plastic surgeon. James, Jr., was admitted to the Mobile Infirmary on August 3, and the dead tissue on his right foot, including the big toe, was amputated."
656 So.2d at 377-79.
Initially, Dr. Dempsey argues that the trial court erred in allowing the Phelpses' expert witness, Dr. Frank Catinella, to testify regarding the standard of care allegedly breached in this case. He maintains that Dr. Catinella was not a "similarly situated health care provider" as required for medical liability standard-of-care testimony pursuant to Ala Code 1975, § 6-5-548, and this Court's interpretation of that statute inMedlin v. Crosby, 583 So.2d 1290 (Ala. 1991).
In Medlin, this Court established a framework under § 6-5-548
for determining whether an expert witness is qualified to testify in a medical malpractice case. Pursuant to Medlin, the trial court must answer the following questions before determining whether as to the defendant an expert witness is "similarly situated":
 "(1) What is the standard of care alleged to have been breached? (2) Is the defendant 'health care provider' a specialist in the discipline or school of practice of the standard of care that the court has previously determined is alleged to have been breached? (3) Does the proffered expert witness qualify as a 'similarly situated health care provider' under the subsection determined in the second step to apply."
583 So.2d at 1293.
As to question (1), Dempsey maintains that the standard of care alleged to be breached here is that of an orthopedic surgeon providing care for a child after clubfoot surgery. Dempsey argues that Dr. Catinella, who is a board-certified cardiovascular thoracic surgeon, was not qualified to testify as to this standard of care. However, we agree with the trial court that this case concerned "a vascular matter, not an orthopedic matter" — in other words, that the Phelpses' claims regarded Dr. Dempsey's alleged failure to properly treat the child's foot during the post-surgery phase for the circulatory and vascular problems that developed after the surgery and casting of the foot. These problems are not isolated to this type of surgery, and they do not concern the orthopedic surgery performed by Dr. Dempsey; they concern the treatment of the infection after the surgery that resulted in the loss of his foot. The standard of care allegedly breached was that of a health care provider treating a patient for post-surgical vascular problems and infection, which are not specific to orthopedic surgery.
Dr. Dempsey is, without question, a specialist in orthopedic surgery. He is a board-certified orthopedic surgeon, and since 1980 he has been licensed to practice medicine in Alabama. However, he is not a specialist in treating vascular problems resulting from surgery; it was in regard to treating those problems that the alleged breach of the standard of care occurred. "[F]or purposes of determining whether a 'health care provider' is a 'specialist,' . . . the trial court should look to whether the defendant 'health care provider' is board certified in the specialty or discipline or school of practice that covers the area of the alleged breach." Medlin, supra, at 1294.
Because Dr. Dempsey was not a "specialist" in the area of the alleged breach, we must determine whether Dr. Catinella, as the Phelpses' expert witness, was a "similarly situated health care provider" under § 6-5-548(b). That section states:
 "[A] 'similarly situated health care provider' is one who:
 "(1) Is licensed by the appropriate regulatory board or agency of this or some other state; and
 "(2) Is trained and experienced in the same discipline or school of practice; and
 "(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred."
Dr. Catinella is board-certified in the areas of general surgery and cardiovascular and thoracic surgery. Because of this certification, *Page 1345 
Dr. Catinella is permitted to practice vascular surgery. After his internship at Northshore University Hospital in Chicago and his residency in New York University Medical Center, Dr. Catinella completed a three-year fellowship in cardiovascular, vascular, and thoracic surgery at Rush-Presbyterian St. Luke Medical Center in Chicago. He has specialized in cardiovascular and thoracic surgery and has published medical studies in numerous journals. Dr. Catinella is consulted by other surgeons regarding the treatment of post-surgical infections relating to a loss of blood flow to the body area affected by the surgery.
Dr. Catinella was at least as qualified as Dr. Dempsey in the field of the alleged breach in this case, and we conclude that he is a "similarly situated health care provider" as that term is defined in § 6-5-548(b). In holding that Dr. Catinella could testify as to the standard of care in this case, the trial court correctly relied upon this Court's holding in Olsen v.Rich, 657 So.2d 875 (Ala. 1995). Like the witness in Olsen, Dr. Dempsey, although he was a specialist in his own surgical practice, was not a specialist in the area of the alleged breach — the treatment of vascular injury. Therefore, the trial court did not err in allowing Dr. Catinella to testify regarding Dr. Dempsey's alleged breach of the standard of care. As this Court noted in Rodgers v. Adams, 657 So.2d 838
(Ala. 1995), the experience and training of an expert witness and that of a defendant medical provider are not required to be exactly the same:
 "The Medical Liability Act does not require that the defendant health care provider and the expert witness have identical training, experience, or types of practice, or even the same specialties. To be 'similarly situated,' an expert witness must be able to testify about the standard of care alleged to have been breached in the procedure that is involved in the case."
657 So.2d at 842.
Dr. Dempsey next maintains that the trial court erred in excluding evidence of the child's Social Security records, as well as photographs from medical articles authored by his expert witness Dr. David Hootnick. The Social Security records indicated that, shortly after the child was born, the Phelpses applied for him to be classified by the Social Security Administration as 100% disabled. The Social Security Administration evaluated the child's spina bifida condition and determined that he was 100% disabled. Dr. Dempsey maintains that the Social Security records would have helped him to cross-examine the Phelpses regarding their statements that the child was not "abnormal" before he lost a portion of his foot.
The photographs in question showed tissue injury suffered by other patients following surgery similar to that undergone by the Phelpses' child. The photographs, which were portions of Dr. Hootnick's articles, were not admitted into evidence, although the text of the articles was read into evidence by Dr. Hootnick. Dr. Hootnick meticulously testified regarding several cases of postsurgery tissue loss that were described in the articles.
Before trial, the court granted the Phelpses' motion in limine regarding the Social Security evidence. The Phelpses maintained that the evidence would prejudice the jury. Their motion stated:
 "[James, Jr.,] was born with spina bifida. He was declared totally disabled by Social Security not based on any limitations that this condition placed on him, but rather on this condition's existence alone so that his impoverished family could obtain state medical care for him. Thus the evidence would mislead the jury concerning [the child's] condition [and] would unfairly prejudice his claim."
The trial court excluded the photographs during the trial, stating in part that the prejudice the photographs would cause outweighed their probative value.
Whether to exclude evidence because of its potential to prejudice the jury is within the sound discretion of the trial court. See C. Gamble, McElroy's Alabama Evidence § 21.01(6) (5th ed. 1996). A trial court may exclude evidence, even if it is relevant, if it would serve little or no purpose other than to arouse prejudice in the jury. Ayres v. Lakeshore CommunityHospital, 689 So.2d 39 (Ala. 1997), citing C. Gamble, McElroy's *Page 1346 Alabama Evidence § 21.01(4) (5th ed. 1996). As the Phelpses note, there was no evidence regarding the factors used by the Social Security Administration in determining the child's disability. Assuming, without deciding, that the Social Security records regarding the child's spina bifida were relevant evidence, we conclude that the trial court did not abuse its discretion in prohibiting this evidence, which clearly held a strong potential for prejudice under the circumstances of this action.
We also find no abuse of discretion in the trial court's exclusion of the photographs from the jury. Dr. Hootnick was allowed to testify thoroughly concerning the cases dealt with in his articles, and he compared those cases to the surgery and postoperative vascular problems of the Phelpses' child. In these circumstances, the photographs could conceivably have been excluded as cumulative evidence. See C. Gamble,McElroy's Alabama Evidence § 10.07 (5th ed. 1996). However, in light of the graphic nature of the photographs and the fact that the cases pictured in the photographs had already been described in detail by Dr. Hootnick, the trial court certainly did not abuse its wide discretion in finding the photographs to be more prejudicial than probative. See C. Gamble, McElroy'sAlabama Evidence § 21.01(6) (5th ed. 1996). Contrary to Dr. Dempsey's contention that the photographs of the Phelpses' child also should have been excluded, those photographs "depicted the location and severity" of the injury this child sustained; the trial court did not abuse its discretion in admitting them. Olympia Spa v. Johnson, 547 So.2d 80, 83
(Ala. 1989) ("The trial judge is vested with discretion not only in his determination as to the preliminary proofs offered to identify the photograph or to prove that the photograph is an accurate representation . . ., but also in his determination of whether the picture will aid the jury or tend to confuse or prejudice it.").
Dr. Dempsey next argues that the trial court erred in submitting the issue of wantonness and punitive damages to the jury. As noted above, the jury awarded a total of $270,000 in damages to the Phelpses. The jury classified the award as $125,000 for punitive damages; $20,000 for past compensatory damages; and $125,000 for future compensatory damages. Dr. Dempsey maintains that the Phelpses submitted "only evidence . . . that there was a difference of opinion about the care [the child] should have received after his clubfoot surgery was performed," and that there was no evidence to demonstrate the wantonness required for an award of punitive damages. He also contends that if the award is not set aside, then the punitive damages award should be remitted.
Wantonness occurs where a person intends to injure another; it also occurs where one acts, or fails to act, with a knowledge and consciousness that his action or failure to act will likely result in injury to another. Wright v. Terry,646 So.2d 11 (Ala. 1994); Lynn Strickland Sales Service, Inc. v.Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala. 1987); Singtonv. Birmingham Ry., Light Power Co., 200 Ala. 282, 76 So. 48
(1917). The Phelpses presented evidence from which a jury could have found that Dr. Dempsey failed to properly examine the child in regard to the infection after the surgery. Dr. Dempsey told Mrs. Phelps to bring the child back to his office in one month following the surgery, even though he knew that children with spina bifida are at risk for postoperative wound healing infection. Mrs. Phelps testified as to Dr. Dempsey's treatment after he cut back a small part of the top of the child's cast to inspect his foot on July 6, 1987:
 "A. On the top of the foot all the toes were purple and blue and red on the side some. And the top of the foot had kind of a mushy looking place on it that it was draining. It had some drainage on it there and it was — a little black around the edges and it was red. It was just real inflamed looking.
 "Q. Did James have any other symptoms on the 6th of July?
 "A. He had fever and he had diarrhea. He wouldn't eat.
". . . .
 "Q. What information did Dr. Dempsey give you about James's foot? *Page 1347 
 "A. He told me that it was relatively common, that he saw it a lot, that it was cast blisters and that . . . I had nothing to worry about. He said to take him home and not to worry about it, that everything would be fine. To come back in about a week or so. . . .
"Q. Did Dr. Dempsey take James's temperature?
 "A. No, he did nothing else. The only thing that he did that day was cut back on the cast some and talk to me. And he didn't do anything else.
". . . .
 "Q. Did he recommend any kind of treatment for the fever?
 "A. No. . . . On the 7th he was having more diarrhea, he was still running fever, and I just couldn't get him to eat and I was so afraid he was going to dehydrate. So I took him back down to Dr. Dempsey's office and he wouldn't even see us.
 "I sat out there and argued with the nurse for a while and then he came to the door and took us right inside the hall. And he looked at it and he said it's the same thing I told you yesterday, it has cast blisters and he dismissed us. . . . [James, Jr.,] still had the fever, the diarrhea, the toes were swollen and he had some drainage. It was starting to smell.
 "Q. On the 7th did Dr. Dempsey take James's temperature?
 "A. No. . . . On the 8th I went back to Dr. Dempsey's office. [James, Jr.,] was still running a fever, still had the diarrhea. I was just — I was starting to panic. I took him back to Dr. Dempsey's office and he just seemed angry that I was there and he looked at his foot again and he told me, he said there's nothing wrong with this foot, it has some cast blisters and if he's having these problems that you keep explaining you take him to the pediatrician . . . maybe he's got an ear infection. . . .
 "Q. On the 8th of July did Dr. Dempsey take James's temperature?
"A. No.
"Q. Did Dr. Dempsey check James's ears?
"A. No.
"Q. Did Dr. Dempsey check James's throat?
"A. No.
"Q. Did Dr. Dempsey listen to his lungs?
"A. No.
 "Q. Did Dr. Dempsey take a culture of James' foot on the 8th?
"A. No."
After the child had visited his pediatrician, Mr. Phelps took the child back to Dr. Dempsey, on July 11. At Mr. Phelps's insistence, Dr. Dempsey removed the front of the cast and cleaned the foot and wrapped it, but he did not prescribe antibiotics until the next day. At that time the foot was, according to Mrs. Phelps, "swollen" and "the smell was horrible, undescribable" and "it was black on his foot and it was purple and dark red and it had all kinds of pus and drainage." Mrs. Phelps stated that Dr. Dempsey told her and her husband that he "didn't think it was necessary" to remove the cast. The Phelpses produced expert testimony indicating that the child should have been hospitalized on July 12 for evaluation of his vascular infection.
The evidence set out above — merely a sample of the graphic testimony found in the record — combined with the rest of the Phelpses' evidence, including the testimony of the Phelpses' experts, was such that the jury could have properly inferred that Dr. Dempsey acted wantonly in treating the child's infection. Therefore, the jury could properly award the Phelpses punitive damages. Moreover, the trial court did not err in refusing to remit the $125,000 punitive damages award. The trial court has much discretion in determining whether to grant a new trial and, in that regard, whether to require a remittitur; that discretion was not abused here. See Fields v.Parker, 361 So.2d 356 (Ala. 1978); Crown Life Insurance Co. v.Smith, 657 So.2d 821 (Ala. 1994).
Dr. Dempsey next contends that the trial court erred in submitting to the jury a charge regarding future damages, as well as a charge stating that the child's preexisting condition did not excuse negligence or wantonness on Dr. Dempsey's part. However, *Page 1348 
the Phelpses submitted expert testimony indicating that the child could later need an artificial foot or lower leg because there is now "nothing on the inner side" of his foot, and that, therefore, his entire foot might have to be amputated. The trial court did not err in charging the jury regarding future damages. In addition, the charge concerning the child's preexisting condition was a correct statement of the law — a defendant is responsible for the probable consequences of his actions, regardless of the preexisting condition of the plaintiff. See Britton v. Doehring, 286 Ala. 498, 506,242 So.2d 666, 673 (1970) (" 'once the element of injury proximately caused by the [defendant] is introduced, it is traditional that the defendant take the plaintiff as he finds him' ") (quoting Lipscomb v. Diamiani, 226 A.2d 914
(Del.Super. 1967)). See also Prescott v. Martin, 331 So.2d 240
(Ala. 1976) (holding no error where trial court informed a jury that it could base an award on all damage proximately resulting from the defendant's actions, even if the plaintiff's injuries were more serious because of her preexisting condition).
Dr. Dempsey next argues that the trial court erred in striking Juror A from the jury during the trial. A was a teacher at a school affiliated with Dr. Dempsey's church, and Dr. Dempsey's daughter attends that school. During a break in the trial, Mrs. Phelps overheard a conversation in a restroom in which another juror said to A, "I am surprised that they left you on the jury." The Phelpses moved to strike A, and the trial court held a private interview with A. The trial court stated that A felt that she did not want to serve any further on the jury and that she could not give either side a fair and impartial trial. A was then questioned by the attorneys for both the Phelpses and Dr. Dempsey. A stated that some friends of Dr. Dempsey were present during the trial and that those friends were the parents of A's daughter's best friend. She stated that "she would rather not sit on this trial," but stated that she "thought" she could make a fair decision. Although during the voir dire examination the Phelpses knew ofA's employment at the church school, they were unaware of Dr. Dempsey's connections with the church until he testified at trial.
The trial court has broad discretion in sustaining or denying a challenge for cause, and its ruling in that regard will not be reversed unless it was plainly erroneous. Boykin v. Keebler,648 So.2d 550 (Ala. 1994); Roberts v. Hutchins, 613 So.2d 348
(Ala. 1993). The trial court took proper steps in questioning A
about her involvement with Dr. Dempsey's church and then allowing the attorneys for both sides to question her. We must conclude that the trial court did not abuse its discretion in granting the Phelpses' motion to strike A from the jury because of A's connections with the church school, particularly when we consider those connections along with her acquaintance with Dr. Dempsey's friends and her equivocal statements about whether she could fairly decide the case.
Dr. Dempsey next argues that the trial court abused its discretion in granting the Phelpses' motion in limine in regard to several experts Dr. Dempsey planned to call as witnesses, and in denying his motion for a continuance after the trial court granted that motion in limine.
The motion was made in response to Dr. Dempsey's supplemental response to the Phelpses' interrogatories; that response listed several new witnesses to be called and expanded the testimony of other witnesses that had been previously listed. Dr. Dempsey's attorneys stated that they had had problems obtaining medical records from the Phelpses' attorneys and had only recently received certain arteriogram films of the child. After the trial court had conducted an extensive hearing on the morning the trial began, it granted the motion in limine and denied the motion for a continuance. The trial court stated:
 "THE COURT: I grant the motion in limine. And I knew this was coming and I don't want to put this up here for the jury later.
 "DEFENSE COUNSEL: Your Honor, can I make a motion, though, to move for a continuance? Your Honor, because —
 "THE COURT: This is nothing more than gamesmanship. *Page 1349 
"DEFENSE COUNSEL: Your Honor, it —
 "THE COURT: And, you know, you've got another motion claiming that he didn't give you something and you've been complaining consistently that, you know, you haven't been getting this and you haven't been getting that and it is just simply two-faced for you to come in here when you've had records since at least the 16th of February and say, you know —
"DEFENSE COUNSEL: Well, Your Honor, can —
 "THE COURT: — 'I didn't give them to him because of something that's just totally irrelevant.'
 "DEFENSE COUNSEL: Your Honor, well, could we move for a continuance? Your Honor, we cannot —
 "THE COURT: The motion for a continuance is denied.
". . . .
 "DEFENSE COUNSEL: Your Honor, we cannot — Your Honor, I don't understand what you're —
 "THE COURT: Well, it's real simple and I'll put it in the record. You have had these scans, by your own admission, for over a month, since at least the 16th of February. And for reasons known only to you, and they may be perfectly valid reasons to you, I don't impute anybody's motivations here, you chose not to disclose the names of thirteen doctors until approximately one week before trial."
Our review of the record indicates that the trial court did not abuse its discretion in granting the Phelpses' motion in limine concerning these experts and in denying Dr. Dempsey's motion for a continuance.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX and SHORES, JJ., concur.
BUTTS, J., concurs in the result.