STUART, Justice.
Dr. Juan Ronderos and Coastal Neurological Institute, P.A., appeal by permission from the trial court’s denial of their motion for a summary judgment in a medical-malpractice action filed by Myrtle Ro-well, as administratrix of the estate of Richard Larry Rowell, deceased. See Rule 5, Ala. R.App. P. The general issue *424 on appeal is whether the trial court properly denied Coastal Neurological and Dr. Ronderos’s motion for a summary judgment. The specific issue presented is whether Mrs. Rowell’s proffered expert, Dr. John Regan, is a “similarly situated health care provider,” within the meaning of § 6 — 5—548(b) or (c), Ala.Code 19Y5, whichever is applicable, and thus qualified to testify as an expert against Dr. Ronde-ros.
If Dr. Regan is a similarly situated health-care provider under either of those subsections, then he is competent to testify, and the trial court properly denied Coastal Neurological and Dr. Ronderos’s motion for a summary judgment. If Dr. Regan is not a similarly situated healthcare provider under either of those subsections, then Dr. Regan is not competent to testify as an expert, and the trial court should have granted Coastal Neurological and Dr. Ronderos’s motion for a summary judgment, because Mrs. Rowell has proffered no other expert to testify as to the alleged breach of the standard of care. Another issue presented for our consideration is whether subsection (b) or subsection (c) of § 6-5-548 applies in determining whether Dr. Regan is a similarly situated health-care provider.
We find that the trial court did not exceed its discretion in finding that § 6-5-548(b) was the applicable subsection and in finding that Dr. Regan was a similarly situated health-care provider, within the meaning of § 6 — 5—548(b). Thus, Dr. Re-gan is qualified to testify as an expert against Dr. Ronderos; the trial court properly denied Coastal Neurological and Dr. Ronderos’s motion for a summary judgment. We affirm.

Background,

The evidence establishes the following facts:
Richard Larry Rowell sustained an on-the-job injury to his back, and he sought medical treatment for the injury. Mr. Ro-well was referred to a neurosurgeon at Coastal Neurological for surgery. Dr. Ronderos, a board-eligible neurosurgeon employed by Coastal Neurological, ultimately treated Mr. Rowell.
After examining Mr. Rowell, Dr. Ronde-ros determined that Mr. Rowell had two surgical options: a thoracoscopic[1] diskec-tomy (a closed procedure) or a thoracoto-my (an open procedure). Dr. Ronderos asserts that he explained the anticipated risks and benefits of each procedure, including the fact that approximately 25% of closed procedures are converted to open procedures during the surgery. Mr. Ro-well elected the thoracoscopic diskectomy (the closed procedure).
On February 10, 1998, Dr. Ronderos performed a thoracoscopic diskectomy on Mr. Rowell. On February 12, 1998, Dr. Ronderos performed another thoracoscopic diskectomy on Mr. Rowell. Approximately five hours into this second surgery, Dr. Ronderos decided to convert the surgery from the closed procedure to the open procedure.
Two hours into the open procedure, Mr. Rowell went into cardiac arrest. He could not be resuscitated, and he died during surgery.
Mr. Rowell’s wife, Myrtle Rowell, as the administratrix of Mr. Rowell’s estate, filed this medical-malpractice action. She alleges that Coastal Neurological and Dr. Ronderos negligently failed to provide rea *425 sonably proper and adequate medical care and treatment to Mr. Rowell by
“(a) negligently failing to properly obtain informed consent prior to the February 10, 1998 and February 12, 1998 surgeries;
“(b) negligently performing a thoraco-scopic thoracic-diskectomy on February 10,1998;
“(c) negligently performing a thoraco-scopic thoracic-diskectomy on February 12,1998;
“(d) negligent monitoring and treatment of blood loss and/or decreased volume status during the February 12, 1998, surgery;
“(e) negligent conversion of thoraco-scopic T 11-12 diskectomy on February 12, 1998 into an open thoracotomy in a patient with signs and symptoms of a decreased blood volume status; and/or
“(f) negligent failure to timely and properly resuscitate Mr. Rowell.”
Mrs. Rowell presented Dr. John Regan as her only expert witness. Dr. Regan is an orthopedic surgeon. At the time of Mr. Rowell’s surgeries, Dr. Ronderos was not a board-certified neurosurgeon; however, he became board-certified in neurosurgery in May 1998, three months after Mr. Rowell’s surgeries. Thus, although Dr. Ronderos was not board-certified when he performed the surgeries on Mr. Rowell, he was board-certified when this action was filed.
Dr. Ronderos and Coastal Neurological moved for a summary judgment, asserting, among other things, that Dr. Regan was not a similarly situated health-care provider as required by § 6-5-548, Ala.Code 1975, and, thus, that Dr. Regan was not competent to testify against Dr. Ronderos as an expert in this medical-malpractice action. The trial court denied Coastal Neurological and Dr. Ronderos’s motion and certified the issue for an interlocutory appeal pursuant to Rule 5, Ala. R.App. P. We granted Dr. Ronderos and Coastal Neurological permission to appeal from the trial court’s ruling on this specific issue.[2]

Discussion

The plaintiff in a medical-malpractice action must prove by substantial evidence that the defendant health-care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health-care providers in the same general line of practice ordinarily have and exercise in a like case. § 6-5-548(a), Ala. Code 1975. To meet this burden, a plaintiff ordinarily must present expert medical testimony; however, that testimony must be from a “similarly situated health care provider.” See § 6~5-548(e), Ala.Code 1975; Leonard v. Providence Hosp., 590 So.2d 906 (Ala.1991).
Section 6-5-548, Ala.Code 1975, provides two alternative definitions of a “similarly situated health care provider,” depending upon whether the defendant health-care provider is a “specialist” or a “nonspecialist.” See § 6-5-548(b) and (c), Ala.Code 1975. Section 6-5-548(b) defines a “similarly situated health care provider” if the defendant is not a specialist. It provides:
*426 “(b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not .hold himself or herself out as a specialist, a ‘similarly situated health care provider’ is one who meets all of the following qualifications:
“(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same discipline or school of practice.
“(3) Has practiced in the same discipline or .school of practice during the year preceding the date that the alleged breach of the standard of care occurred.”
Subsection (c) defines a “similarly situated health care provider” if the defendant is a specialist. It provides:
“(c) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the1 health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, and holds himself or herself out as a specialist, a ‘similarly situated health care provider’ is one who meets all of the following requirements:
“(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same specialty.
“(3) Is certified by an appropriate American board in the same specialty.
“(4) Has practiced in this specialty during the year preceding the date that the alleged, breach of the standard of care occurred.”
In order to determine whether subsection (b) or (c) is applicable to Dr. Regan, we must first determine whether Dr. Ronde-ros qualifies as a “specialist.”'

When Must the Defendant Health-Care Provider Obtain Certification to Trigger the Application of § 6-5-5U8(c) to an Expert Witness?

Coastal Neurological and Dr. Ronderos assert that, although Dr. Ronderos was not board-certified at the time of the alleged malpractice, he was board-certified at the time Mrs. Rowell filed this action. Coastal Neurological and Dr. Ronderos argue that the requirement in § 6 — 5—548(c) that the defendant health-care provider be certified by an appropriate American board does not mean the defendant must be certified at thé time the cause of action accrued, but only that the health-care provider must be certified when the plaintiff files the complaint. Because Dr. Ronderos was board-certified in neurosurgery at the time Mrs. Rowell filed her action, Coastal Neurological and Dr. Ronderos argue that Dr. Ronderos meets all of the criteria for a “specialist” listed in § 6-5-548(e). Thus, they argue, Dr. Regan should not be allowed to testify against Dr. Ronderos because only a board-certified- neurosurgeon is competent to testify as an expert witness against Dr. Ronderos in this action. We disagree.
Coastal Neurological and Dr. Ronderos’s creative interpretation of § 6-5-548(c) cannot be correct. Under that interpretation, credentials obtained by the defendant health-care provider after the date of the alleged malpractice would influence the testimony given at trial and would influence the determination of the stan *427 dard of care the defendant is alleged to have breached. The date of the alleged breach is the date on which the defendant acted and the date on which the defendant made the decisions that allegedly breached the applicable standard of care. It is this standard of care to which the medical expert will be testifying in a medical-malpractice action. Thus, it is the defendant’s training, experience, and credentials, as they exist on the date of the alleged breach, that must be considered in determining who may testify against the defendant health-care provider as a similarly situated health-care provider. The reference to a “similarly situated” health-care provider refers to someone situated similarly to the defendant at the time of the alleged breach — not to someone situated similarly to the defendant at whatever time the action happens to be filed.
We find support for this construction of § 6-5-548(c) in another section of that statute. In 1996, the Legislature amended § 6-5-548(e) to read:
“(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a ‘similarly situated health care provider’ as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty.”
(Emphasis added.)
In subsection (e), the Legislature refers to certification by a board in a “specialty” and then refers to practicing “that specialty at the time of the alleged breach of the standard of care.” We find it evident in this language that the appropriate date on which to determine whether a defendant health-care provider is a “specialist,” for purposes of § 6-5-548(c), is the date on which the alleged breach occurred.
Moreover, it would be patently unfair, both to the plaintiff and to the defendant health-care provider, to apply at trial a standard of care based on circumstances occurring after the alleged malpractice rather than a standard of care based on circumstances existing on the date of the alleged malpractice. That is exactly the scenario we would be creating if we considered certifications received by a defendant health-care provider after the date of the alleged act of malpractice in determining who is a similarly situated health-care provider for purposes of testifying in a medical-malpractice action. We conclude that, under § 6-5-548(c), it is the defendant’s credentials on the date of the alleged breach that must be considered in determining who may testify against the defendant as a similarly situated health-care provider.
Dr. Ronderos was not board-certified on the dates of Mr. Rowell’s surgeries in this case. For that reason, Dr. Ronde-ros cannot be considered a specialist, within the meaning of § 6-5-548(c), at the time he allegedly breached the applicable standard of care in this case. Accordingly, the applicable subsection of § 6-5-548, Ala. Code 1975, in this case is subsection (b), *428 which applies to health-care providers who are not specialists.

Application of § 6-5-548(b)

To be considered a similarly situated health-care provider under § 6-5-548(b), a physician must meet the following requirements:
“(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same discipline or school of practice.
“(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.”
Dr. Regan meets all of these requirements. He is licensed as a physician in several states, including California and Texas. Therefore, he meets the requirement of subsection § 6 — 5—548(b)(1). Dr. Regan helped develop the thoracoscopic disk procedure in the United States — the same procedure Dr. Ronderos performed on Mr. Rowell. Dr. Regan testified during deposition that both orthopedic surgeons and neurosurgeons perform this procedure — he referred to them both as “spine surgeons”; he testified that he teaches both orthopedists and neurosurgeons to perform this procedure and that “they are both taught to utilize and trained to utilize the same basic standards of care in doing this surgery.” Dr. Ronderos’s own expert, Dr. Curtis Dickman, testified that the standard of care is the same whether an orthopedic surgeon or a neurosurgeon performs a thoracoscopic diskectomy.[3]
We find that Dr. Regan’s experience and training meet the requirements of the “same discipline or school of practice” required by § 6-5-548(b)(2). See Dowdy v. Lewis, 612 So.2d 1149 (Ala.1992) (physician who taught in the field of practice at issue in a medical-malpractice case was deemed to be an expert in that field of practice); Rodgers v. Adams, 657 So.2d 838 (Ala.1995) (prosthodontist was a similarly situated health-care provider as to a general dentist who was not board-certified; both the prosthodontist and the general dentist were qualified to perform the procedure in question^ and the prosthodontist testified that, in the year preceding the defendant’s alleged breach of the standard of care, he performed some general dentistry in his work); Olsen v. Rich, 657 So.2d 875 (Ala.1995) (vascular, cardiac, pulmonary, and esophageal surgeon was a similarly situated health-care provider in a case alleging medical negligence against a cardiologist involving a procedure with which the surgeon was very familiar); Dempsey v. Phelps, 700 So.2d 1340 (Ala.1997) (cardiovascular thoracic surgeon was a similarly situated health-care provider with respect to defendant orthopedic surgeon, who was not board-certified in area in which he allegedly breached the standard of care; cardiovascular thoracic surgeon was at least as qualified as the defendant in the field of the alleged breach). Dr. Regan meets the requirements of § 6-5-548(b)(2).
Finally, Dr. Regan testified that he was performing this surgery in 1998, that he performed it often, and that he had been doing so for some years before 1998. In addition, Dr. Regan is one of the editors of a textbook entitled Atlas of Endoscopic Spine Surgery, which was published in 1996. He has published over 20 articles in medical journals and has edited or written 14 articles or chapters in different text *429 books dealing with the subject of thoraco-scopic spine surgery. For these reasons, Dr. Regan meets the requirements of subsection § 6 — 5—548(b) (3).
The evidence before us indicates that Dr. Regan has sufficient knowledge and training to testify as an expert regarding the standard of care applicable in this case. As we noted in Rodgers v. Adams, supra:
“The Medical Liability Act does not require that the defendant health care provider and the expert witness have identical training, experience, or types of practice, or even the same specialties. To be ‘similarly situated, ’ an expert witness must be able to testify about the standard of care alleged to have been breached in the procedure that is involved in the case. For example, if the parties were reversed in this case, so that the prosthodontist, Dr. Ramus, was the defendant and the general dentist, Dr. Adams, was the expert, we would reach the same result. Dr. Adams would be allowed to testify because the standard of care alleged to have been breached involved general dentistry and not prosthodonties; section 6-5-548(b) would apply in that reversed situation. Also, a general surgeon would be qualified to testify that an orthopedic surgeon breached the standard of care if the procedure was common to both disciplines, as is the case here. Specifically, if the incident involved an alleged negligent suturing of an incision, a general surgeon would be qualified to testify that an orthopedic surgeon had breached the standard.”
657 So.2d at 842 (emphasis omitted; emphasis added; citations omitted). We conclude that Dr. Regan has the training and experience to testify to the standard of care applicable to the procedure in question.[4] That is all that is required by § 6-5 — 548(b), Ala.Code 1975.

Conclusion

Dr. Regan is competent to testify against Dr. Ronderos in this case, pursuant to § 6 — 5—548(b), Ala.Code 1975, as a similarly situated health-care provider. We affirm the trial court’s denial of the motion for a summary judgment filed by Dr. Ronderos and Coastal Neurological.
AFFIRMED.
MOORE, C.J., and BROWN, HARWOOD, and WOODALL, JJ., concur.

. "Thoracoscopic” refers to an endoscopic surgical procedure performed in the thoracic spine area. "Endoscopic” is a more general term that refers to the use of a scope inside the body.

. In their petition for permission to appeal, Coastal Neurological and Dr. Ronderos argued that § 6-5-548(b), Ala.Code 1975, was ambiguous because it was written in the negative and that the parties and the trial court did not know how properly to apply the subsection to the issue whether Dr. Regan was competent to testify as an expert witness against Dr. Ronderos. This Court considered that issue in deciding whether to grant Coastal Neurological and Dr. Ronderos's request for a permissive appeal. However, Coastal Neurological and Dr. Ronderos do not address this issue in the briefs filed with this Court on appeal. Therefore, we assume they have abandoned the issue.

. Dr. Dickman conducts training workshops in thoracoscopic procedures for thoracic surgeons, orthopedic surgeons, and neurosurgeons. Dr. Dickman testified that he teaches all the surgeons at his workshop the same techniques.

. Coastal Neurological and Dr. Ronderos argue that the issue raised by Mrs. Rowell’s complaint is whether Dr. Ronderos properly monitored Mr. Rowell’s blood loss rather than a technical issue regarding spinal surgery. If this is the issue, would not all surgeons have the same standard of care in monitoring their patients and reporting vital signs to the anesthesiologists and certified registered-nurse anesthetists? Whether the issue relates to a failure to monitor blood loss or a surgical question, we conclude that Dr. Regan, as a similarly situated health-care provider, is competent to testify.