PER CURIAM.
 

 Joyce Robinson (“Mrs. Robinson”), the plaintiff below in this medical-malpractice action, appeals from a summary judgment in favor of the defendant, Baptist Health System, Inc. (“Baptist Health”). We affirm.
 

 On October 7, 2005, Mrs. Robinson, acting individually and on behalf of her husband, Roosevelt Robinson (“Mr. Robinson”), who was then non compos mentis, sued Baptist Health, which operates several hospitals in the Birmingham metropolitan area. Mrs. Robinson alleged that the nursing staff (“the nursing staff’) at Baptist Medical Center — Princeton (“Princeton”), one of the hospitals operated by Baptist Health, had negligently allowed a bedsore to develop on Mr. Robinson’s body while he was a patient there from December 14, 2004, until January 25, 2005, and had negligently allowed the bedsore to worsen. Answering the complaint, Baptist Health denied that the nursing staff had been negligent.
 

 Thereafter, Mr. Robinson died from causes unrelated to the alleged negligence of the nursing staff. Following Mr. Robinson’s death, Mrs. Robinson amended her complaint to substitute herself, in her capacity as the personal representative of Mr. Robinson’s estate, for herself as the representative of Mr. Robinson due to his incompetency. She then prosecuted the personal-injury claim that had belonged to Mr. Robinson before his death in her capacity as the personal representative of his .estate and she continued to prosecute her loss-of-consortium claim in her individual capacity.
 

 Following the completion of discovery, Baptist Health moved the trial court for a summary judgment. As the ground of its summary-judgment motion, Baptist Health asserted that Mrs. Robinson could not prove that the alleged negligence of the nursing staff had caused the development or the worsening of Mr. Robinson’s bedsore. In support of its summary-judgment motion, Baptist Health submitted the deposition of Dr. Rian Montgomery, Mr. Robinson’s treating physician at Princeton.
 

 In response to Baptist Health’s summary-judgment motion, Mrs. Robinson submitted, among other things, excerpts from the depositions of her nursing expert, Jan Boswell; Dr. Timothy Real, Baptist Health’s expert regarding causation; and Dr. Montgomery.
 

 Baptist Health moved to strike the portions of Boswell’s testimony in which she offered an opinion regarding the cause of the development and worsening of Mr. Robinson’s bedsore. Baptist Health also submitted the complete deposition of Dr. Real.
 

 Following a hearing, the trial court entered an order granting Baptist Health’s motion to strike and its summary-judgment motion. Mrs. Robinson moved the trial court to alter, amend, or vacate the summary judgment in favor of Baptist Health pursuant to Rule 59(e), Ala. R. Civ. P.; however, that motion was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. Thereafter, Mrs. Robinson timely appealed to the supreme court, which transferred her appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
 

 “ ‘We review a summary judgment de novo.’
 
 Potter v. First Real Estate Co.,
 
 844 So.2d 540, 545 (Ala.2002) (citation omitted). ‘Summary judgment is appropriate only when “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” ’
 
 Ex parte Rizk,
 
 
 *1122
 
 791 So.2d 911, 912 (Ala.2000) (citations omitted).
 

 “ ‘In determining whether the non-movant has created a genuine issue of material fact, we apply the “substantial-evidence rule” — evidence, to create a genuine issue of material fact, must be “substantial.” § 12-21-12(a), Ala.Code 1975. “Substantial evidence” is defined as “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 West v. Founders Life
 
 As
 
 surance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989).’
 

 “Callens v. Jefferson County Nursing Home,
 
 769 So.2d 273, 278-79 (Ala.2000) (footnote omitted). In deciding a motion for a summary judgment, or in reviewing a summary judgment, the court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable factual doubts in favor of the nonmoving party.
 
 Bruce v. Cole,
 
 854 So.2d 47 (Ala. 2003), and
 
 Pitney Bowes, Inc. v. Berney Office Solutions,
 
 823 So.2d 659 (Ala.2001).
 
 See Ex parte Helms,
 
 873 So.2d 1139 (Ala.2003), and
 
 Willis v. Parker,
 
 814 So.2d 857 (Ala.2001).”
 

 Hollis v. City of Brighton,
 
 885 So.2d 135, 140 (Ala.2004).
 

 The party moving for summary judgment bears “ ‘the burden of production, i.e., the burden of making a prima facie showing that he is entitled to summary judgment.’ ”
 
 Ex parte General Motors Corp.,
 
 769 So.2d 903, 909 (Ala.1999) (quoting
 
 Berner v. Caldwell,
 
 543 So.2d 686, 691 (Ala.1989) (Houston, J., concurring specially)).
 

 “ ‘The manner in which the movant’s burden of production is met depends upon which party has the burden of proof ... at trial_
 

 “ ‘If the burden of proof at trial is on the nonmovant, the movant may satisfy the Rule 56[, Ala. R. Civ. P.,] burden of production
 
 ... by demonstrating to the trial court that the nonmovant’s evidence is insufficient to establish an essential element of the nonmovant’s claim
 
 ....
 

 “ ‘The nonmovant may defeat a motion for summary judgment that asserts that the nonmovant has no evidence to establish an essential element of his claim by directing the trial court’s attention to evidence of that essential element already in the record, that was ignored or overlooked by the movant, or may submit an affidavit requesting additional time for discovery, in an attempt to obtain some evidence of that essential element of the claim, in accordance with Rule 56(f), [Ala.] R. Civ. P.
 

 “
 
 ‘If the nonmovant cannot produce sufficient evidence to prove each element of its claim, the movant is entitled to a summary judgment, for a trial would be useless.’
 
 ”
 

 Ex parte General Motors Corp.,
 
 769 So.2d at 909 (quoting
 
 Berner,
 
 543 So.2d at 691 (Houston, J., concurring specially)) (emphasis added).
 

 As noted above, in reviewing the summary judgment, we must accept the tendencies of the evidence that are most favorable to Mrs. Robinson and resolve all reasonable factual doubts in her favor.
 
 See Hollis v. City of Brighton,
 
 supra. Viewed in that manner, the evidence before the trial court establishes the following facts.
 

 On the night of December 13, 2004, Mrs. Robinson found Mr. Robinson lying unconscious on the floor of their home. Mr. Robinson, who was then 73 years old, had
 
 *1123
 
 had a history of vascular disease. He was taken to the emergency room at Princeton where the emergency-room staff found that he was unresponsive and unable to breathe without assistance. He was intu-bated and placed on a ventilator. Soon, he began to experience seizures. The emergency-room staff successfully treated Mr. Robinson’s seizures; however, he remained completely unresponsive. The emergency-room staff transferred Mr. Robinson to the intensive-care unit at Princeton.
 

 Mr. Robinson remained dependent on the ventilator for several days after he was transferred to intensive care. Moreover, he remained completely unresponsive until December 23, 2004. He was fed by tube but did not tolerate this well. On December 23, he began to exhibit a minimal amount of improvement in his mental status, and the improvement continued over the next several days. By December 27, he was able to follow some commands and could move all four extremities. He continued to improve slowly. Eventually, he improved to the point that he could be moved out of the intensive-care unit, although his condition had not improved to the point that he could be discharged. On the night of January 24, 2005, Mr. Robinson’s blood pressure dropped to the point that he had to be given a bolus of fluid. Subsequent checks of his blood pressure indicated that his blood pressure had returned to normal in his right arm but was still low in his left arm, which indicated the possibility that he had a circulation problem in his left arm.
 

 Dr. Montgomery recommended that some tests be performed; however, Mr. Robinson’s family instructed Dr. Montgomery not to perform any tests and informed him that they were dissatisfied with the care Mr. Robinson was receiving at Princeton because he had developed a bedsore and thrush, a problem involving fungus in the mouth. Dr. Montgomery testified that he did not know that Mr. Robinson had a bedsore until Mr. Robinson’s family told him on January 24 and that he did not examine it after the family informed him of its existence because Mr. Robinson’s family had instructed him not to perform any further examinations or tests on Mr. Robinson. On January 25, Mr. Robinson’s family had Mr. Robinson transferred to the University of Alabama at Birmingham Hospital (“UAB”). Upon Mr. Robinson’s arrival at UAB, the medical staff there noted that Mr. Robinson had a stage-two bedsore that was approximately 120 millimeters by 120 millimeters in size located on his sacrum.
 

 The medical profession categorizes bedsores using a four-stage continuum. A reddening or blanching of the skin without an open wound is categorized as a stage-one bedsore. An open wound in the skin that is not deep enough to reveal the subcutaneous fat is categorized as a stage-two bedsore. An open wound that is deep enough to reveal the subcutaneous fat but is not deep enough to reveal the muscle, ligaments, tendons, or bones underneath the subcutaneous fat is categorized as a stage-three bedsore. An open wound that is deep enough to reveal the muscle, ligaments, tendons, or bones underneath the subcutaneous fat is categorized as a stage-four bedsore.
 

 Approximately two to three weeks before Mr. Robinson’s January 25, 2005, departure from Princeton, his family had noticed a small red spot on his lower back while he was being bathed. Mrs. Robinson described the spot as being the size of one of the three holes in three-ring-binder paper. Mr. Robinson’s family did not see his lower back again until after Mr. Robinson departed from Princeton on January 25.
 

 
 *1124
 
 On December 31, 2004, the nursing staff noted for the first time that Mr. Robinson had denuded skin on his lower back. On January 19, 2005, the nursing staff noted for the first time that Mr. Robinson had an open wound on his lower back.
 

 Dr. Montgomery testified that a bedsore is a breakdown of the skin caused by its being compressed between a bony structure inside the body and a surface outside the body such as a bed. Dr. Montgomery testified that he did not know how long a patient’s skin would have to be compressed before a bedsore would develop. He also testified that he could not predict what would happen if a bedsore is left untreated. Dr. Montgomery further testified that, in his experience, patients can develop bedsores despite receiving good care. Moreover, he testified that, although turning an immobile bedridden patient on a regular basis and inspecting the patient’s skin on a regular basis would reduce the chance that the patient would develop a bedsore, in his opinion neither the development nor the worsening of Mr. Robinson’s bedsore to a stage-two bedsore was caused by any act or omission on the part of the nursing staff.
 

 Like Dr. Montgomery, Dr. Real testified that a bedsore is caused by the compression of the skin between a bony structure inside the body and a surface outside the body. He explained that the compression obstructs the vascular structures that supply blood to the skin in that area and that the obstruction of that blood supply causes damage to the skin, which is the bedsore. Thus, the ultimate cause of bedsores is ischemia, i.e., loss of blood supply, to the tissue for a certain period — the period can vary and, according to some of the literature, can be less than two hours. Dr. Real further testified that bedsores do not develop in the absence of pressure. Although Dr. Real testified that he would expect an immobile patient who is never turned to eventually develop a bedsore at some point, he was not aware of any data indicating what period would need to elapse before the patient developed the bedsore. Dr. Real also testified that leaving a bedsore untreated may not have an adverse result; the bedsore may heal on its own without treatment. Moreover, Dr. Real testified that failing to turn a patient who has a stage-one bedsore may not necessarily cause the bedsore to worsen. Finally, Dr. Real testified that, in his opinion, the care rendered by the nursing staff did not cause Mr. Robinson’s bedsore to develop or worsen.
 

 Boswell, Mrs. Robinson’s nursing expert, testified that, in her opinion, the nursing staff had breached the applicable standard of care in five ways. First, she testified that it had breached the standard of care by failing to assess Mr. Robinson’s risk of developing bedsores when he was admitted to Princeton. Second, she testified that it had breached the standard of care by failing to prepare a written plan of care to prevent bedsores from developing. Third, she testified that it had breached the standard of care by failing to turn Mr. Robinson every 2 hours on 10 separate occasions — the nursing staff failed to turn Mr. Robinson for 3 hours on December 17, 2004; for 3 hours on December 22, 2004; for 6 hours on January 3, 2005; for 4 hours on January 4, 2005; for 6 hours on January 6, 2005; for 4 hours on January 12, 2005; for 4 hours on January 15, 2005; for 6 hours on January 16, 2005; for 12 hours on January 17, 2005; and for 9 hours on January 18, 2005. Fourth, Boswell testified that the nursing staff had breached the standard of care by failing to put Mr. Robinson on a pressure-reduction surface such as an air-filled mattress. Fifth and finally, she testified that the nursing staff had breached the standard of care by failing to obtain an order from Mr.
 
 *1125
 
 Robinson’s physician to add vitamins and minerals to his tube feedings. Boswell further testified that, in her opinion, if the nursing staff had not breached the standard of care in those respects, Mr. Robinson would not have developed a bedsore. However, Boswell acknowledged that a number of factors play a part in the development of bedsores; that not all stage-one bedsores are preventable; that a stage-two bedsore can develop in less than two hours; and that determining what caused a bedsore and whether the bedsore could have been prevented requires a medical judgment, which she is not qualified to make, rather than a nursing judgment.
 

 Mrs. Robinson first argues that the trial court erred in granting Baptist Health’s motion to strike the testimony of Boswell regarding causation and in granting Baptist Health’s summary-judgment motion because, Mrs. Robinson says, Boswell’s testimony regarding causation constituted competent and substantial evidence establishing a prima facie case that a causal connection existed between the alleged negligence of the nursing staff and the development and worsening of Mr. Robinson’s bedsore. We disagree.
 

 “The standard of review applicable to whether an expert should be permitted to testify is well settled. The matter is ‘largely discretionary with the trial court, and that court’s judgment will not be disturbed absent an abuse of discretion.’
 
 Hannah v. Gregg, Bland & Berry, Inc.,
 
 840 So.2d 839, 850 (Ala.2002). We now refer to that standard as a trial court’s ‘exceeding its discretion.’ See, e.g.,
 
 Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc.,
 
 901 So.2d 84, 106 (Ala. 2004) (‘Our review of the record supports the conclusion that the trial court did not exceed its discretion in finding that Jones was properly qualified as an expert under Rule 702[, Ala. R. Evid.,] and in considering his testimony.’). However, the standard itself has not changed.”
 

 Kyser v. Harrison,
 
 908 So.2d 914, 918 (Ala.2005).
 

 Although Boswell expressed an opinion regarding causation, she admitted that she was not qualified to express that opinion. Moreover, Mrs. Robinson made no showing that, aside from her nursing degree, her work experience as a floor nurse, and her informal review of medical literature regarding bedsores, Boswell had any expertise regarding bedsores; Mrs. Robinson made no showing that Boswell had any specialized training or experience in treating bedsores or other wounds. Given Boswell’s admission that she was not qualified to express an opinion regarding the cause of bedsores or their worsening and the failure of Mrs. Robinson to show that Boswell possessed any special expertise regarding bedsores, we cannot hold that the trial court exceeded its discretion in granting Baptist Health’s motion to strike Boswell’s opinion testimony regarding the cause of Mr. Robinson’s bedsore and its worsening.
 
 See Kyser v. Harrison,
 
 908 So.2d at 918-20 (holding that the trial court did not exceed its discretion in excluding a pathologist’s testimony regarding the cause of an infant’s death, which the plaintiff had submitted in opposition to the defendant’s summary-judgment motion, on the ground that the pathologist was not shown to be qualified to express such an opinion). Therefore, we find no merit in Mrs. Robinson’s first argument.
 

 Mrs. Robinson next argues that, even if her nursing expert was not qualified to express an opinion regarding causation, she met her burden of proving causation through the testimony of Dr. Montgomery and Dr. Real. However, although Dr. Montgomery and Dr. Real testified that pressure on the skin is a sine
 
 *1126
 
 qua non of the development and worsening of bedsores, they did not testify that a causal link existed between the breaches of the standard of care that Boswell had identified, on the one hand, and the development and worsening of Mr. Robinson’s bedsore, on the other. Indeed, their testimony tended to disprove the existence of such a causal connection. Therefore, we find no merit in Mrs. Robinson’s second argument.
 

 Finally, Mrs. Robinson argues that a medical-malpractice action based on the development and worsening of a bedsore constitutes an exception to the general rule that the plaintiff in a medical-malpractice action must present expert testimony establishing proximate cause because, she says, the cause of bedsores is within the common knowledge of jurors and does not require the guidance of an expert. However, the evidence in the case now before us does not support that argument. Mrs. Robinson’s own witness, Boswell, testified that determining what caused a bedsore and whether it could have been prevented requires medical judgment that is beyond the ability of a layman. Therefore, we find no merit in Mrs. Robinson’s third and final argument.
 

 Accordingly, we affirm the judgment of the trial court.
 

 AFFIRMED.
 

 All the judges concur.