WISE, Justice.
The defendants, Springhill Hospitals, Inc., d/b/a Springhill Memorial Hospital (“Springhill”), Dennis Rushing, Ashley Fleming, and Janel Ostriechmerer (hereinafter referred to collectively as “the defendants”), appeal from a judgment in favor of the plaintiff, Dimitrios Critopoulos.

Facts and Procedural History

On April 10, 2006, Critopoulos was admitted to Springhill Memorial Hospital to undergo a heart catheterization. On April 11, 2006, Dr. Dimitris Kyriazis performed a cardiac-artery-bypass graft (“CABG”) on Critopoulos. After the surgery, Critopou-los was admitted to the cardiac-recovery unit. Critopoulos was in the cardiac-recovery unit until April 16, 2006, when he was transferred to the cardiac-step-down or cardiac-intervention unit. Around 11:50 a.m. on April 14, 2006, before Critopoulos was transferred, Rushing, a registered nurse who worked in both the cardiac-recovery and cardiac-intervention units performed a reassessment of Critopoulos. During that reassessment, Rushing noticed a discoloration on the back of Crito-poulos’s neck. He subsequently moved Critopoulos from the bed to a chair. At approximately 1:50 p.m., Rushing was helping Critopoulos back to bed when he noticed a blister on the back of Critopou-los’s neck and. a stage I decubitus or pressure ulc.er on Critopoulos’s coccyx. On April 19, 2006, Critopoulos was released from the hospital.
On April 20, 2006, Critopoulos went to Mobile Infirmary, a hospital in Mobile, where he complained of shortness of breath, difficulty breathing, a sacral pressure ulcer, and an open wound in the posterior of his neck. The plastic surgeon at the hospital determined that surgery was not necessary for Critopoulos’s wounds at that time and that the wounds could be treated with local wound care and by applying medicines to the wounds. Cri-topoulos was subsequently released from the hospital.
On May 8, 2006, Critopoulos was again admitted to Mobile Infirmary because the sacral pressure ulcer had gotten worse. The ulcer was debrided by the plastic surgeon at that time. Critopoulos was released from the hospital on May 11, 2006. Critopoulos continued to receive treatment for his wounds until late 2009.
On April 8, 2008, Critopoulos fíléd a medical-malpractice action against Spring- *1180 hill, Rushing, Fleming, Ostriechmerer, and Scott Holcombe.[1] Rushing, Fleming, Os-triechmerer, and Holcombe were all nurses in the cardiac-recovery unit of Spring-hill who provided care for Critopoulos.
On July 10, 2009, Holcombe and the defendants filed an “Objections to Qualifications of Plaintiffs Nursing Expert, Penny Jones, R.N.,” and a motion to exclude her testimony.
The trial in this case started on January 11, 2010. At trial, Penny Jones, a registered nurse who practiced in wound-care management, testified as Critopoulos’s expert witness regarding the standard of care. Jones testified that Rushing, Fleming, Holcombe, and Ostriechmerer had breached the standard of care in this case by not performing an assessment to determine Critopoulos’s risk of developing pressure ulcers; by not turning and repositioning Critopoulos every two hours while he was a patient in the cardiac-recovery unit; and by not developing a plan of care for the prevention of pressure ulcers. She also testified that Fleming and Rushing had breached the standard of care by not providing complete wound assessments after the pressure ulcer developed. At trial, the defense moved to exclude Jones’s testimony on the ground that she was not a similarly situated health-care provider under § 6-5-548, Ala.Code 1975. The trial court denied the motion.
Holcombe and the defendants filed motions for a judgment as a matter of law at the close of Critopoulos’s case-in-chief and again at the close of all the evidence, which the trial court denied. On January 19, 2010, the jury returned a verdict in favor of Critopoulos and against Rushing, Os-triechmerer, Fleming, and Springhill in the sum of $300,000. The jury also returned a verdict in favor of Scott Holcom-be and against Critopoulos.
On February 11, 2010, the defendants filed a renewal of their motions for a judgment as a matter of law or, in the alternative, for a new trial. Critopoulos filed an opposition to the motion. On February 26, 2010, the trial court denied the defendants’ motion. This appeal followed.

Standard of Review

‘“The standard of review applicable to whether an expert should be permitted to testify is well settled. The matter is “largely discretionary with the trial court, and that court’s judgment will not be disturbed absent an abuse of discretion.” Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 850 (Ala.2002). We now refer to that standard as a trial court’s “exceeding its discretion.” See, e.g., Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc., 901 So.2d 84, 106 (Ala.2004) (“Our review of the record supports the conclusion that the trial court did not exceed its discretion in finding that Jones was properly qualified as an expert under Rule 702[, Ala. R. Evid.,] and in considering his testimony.”). However, the standard itself has not changed.’
“Kyser v. Harrison, 908 So.2d 914, 918 (Ala.2005).”
Robinson v. Baptist Health Sys., Inc., 24 So.3d 1119, 1125 (Ala.Civ.App.2009).
“ ‘ “The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict *1181 [now referred to as a preverdict and a postverdict motion for a judgment as a matter of law] is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court’s ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any evidence most favorably to the non-movant.” ’
“Glenlakes Realty Co. v. Norwood, 721 So.2d 174, 177 (Ala.1998) (quoting Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988)).”
Parker v. Williams, 977 So.2d 476, 480 (Ala.2007).

Discussion

In this case, the defendants argue that the trial court erroneously allowed Penny Jones to testify as Critopoulos’s standard-of-care expert because, they argue, she was not a similarly situated health-care provider as to the individual defendants, as required by § 6-5-548, Ala.Code 1975. The Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-540 et seq., Ala. Code 1975, includes the following provisions regarding medical-malpractice claims:
“(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like ease.
“(b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a ‘similarly situated health care provider’ is one who meets all of the following qualifications:
“(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same discipline or school of practice.
“(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.
[[Image here]]
“(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a ‘similarly situated health care provider’ as defined above.”
§ 6-5-548, Ala.Code 1975 (emphasis added). “Standard of care” is defined as:
“The standard of care is that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases. A breach of the standard of care is the failure by a health care provider to comply with the standard of care, which failure proximately causes personal injury or wrongful death. This *1182 definition applies to all actions for injuries or damages or wrongful death whether in contract or tort and whether based on intentional or unintentional conduct.”
§ 6-5-542(2), Ala.Code 1975 (emphasis added).
In this case, Ostriechmerer, Rushing, Holcombe, and Fleming were all nurses in the cardiac-recovery unit. Each was responsible for the total care of Critopoulos immediately following his CABG.
Penny Jones testified that, at the time of trial, she was licensed to practice nursing in North Carolina and that she has been licensed there since 1995 or 1996. She also testified that she was certified as a wound-care nurse by the Wound, Ostomy and Continence Nurses Society and that she was also certified as a wound specialist by the American Association of Wound Management.
With regard to her training, Jones testified that after high school she completed her associate’s degree in nursing. After she completed her degree, she started bedside nursing. Jones testified that she had worked in the intensive-care unit (“ICU”); that she had worked a little bit in the emergency room; that she had worked in nursing homes; and that she had “worked ... just about everywhere except for the operating room.”
Jones testified that she later returned to school and obtained her bachelor’s degree. After that, she went back to school and obtained her master’s degree in 1989. Jones testified that for her master’s degree she focused on cardiopulmonary studies, which includes the heart and lungs, but that her particular focus was the lungs. She also testified that she subsequently worked at a respiratory hospital in Los Angeles, California, and that her work there included weaning patients in the ICU from ventilators.
Jones testified that, in 1992, she moved to Durham, North Carolina, and went to work at Duke University Hospital (“Duke”). She testified that she is the wound-management clinical nurse specialist there and that she wrote the policies and procedures for Duke regarding wound management and treating pressure ulcers. Jones further testified that, in the mid-1990s, she started a “consult service” at Duke. Jones stated:
“There’s a consult service that we have at Duke Hospital, and I run that service, which means that people — other nurses, the physicians will ask us to come and see a patient who has a wound, and the wound could be anything from a post-surgical wound that hasn’t healed, a diabetic foot ulcer, skin tears, pressure ulcers, pretty much — burns, pretty much any kind of wound that you might think of, we’ll see a patient and determine what we should be — what we should do for the wound to help it to heal as well as what the patient needs to do to help the wound to heal.”
(Emphasis added.)
Jones testified that as a clinical specialist she also writes policies for Duke. She also testified that Duke has a “Skin Care Champion Program” that involves bedside nurses who have been specially trained in the prevention of pressure ulcers; that those specially trained bedside nurses then go back and train other nurses on their floors; and that she spent a lot of time in that program teaching the nurses what to do to prevent pressure ulcers. Jones testified that she and her administrator developed a program that is now called the Wound Management Institute. She also testified that she had developed a standard of care regarding the care of patients with chronic skin wounds, which would include pressure ulcers, and that that standard of *1183 care included patients in ICUs who had recently undergone cardiac-bypass surgery.
Jones testified that she had provided wound-management services to cardiac patients since the mid-1990s; that, from that time until the time of trial, she had provided hands-on wound-management care to critical patients in an ICU setting; and that she was providing such care as recently as the Friday before the trial started. She further testified that, specific to wound care and preventing pressure ulcers, she had taught doctors, nurses, and other health-care providers how to take care of cardiac patients in an intensive-care setting. She further testified that, on average 10 times a week, she provided wound-care management to patients who had recently undergone cardiac-bypass surgery and who were in the ICU.
Jones testified that as a wound-management specialist she would perform some of the same clinical services as a regular cardiac-care nurse performed. She would check vital signs and conduct skin assessments. She would also participate in either writing or reviewing care plans. The Friday before the trial was the last time she had provided wound-management care to a cardiac patient in an intensive-care setting. She also testified that she had treated or managed postoperative cardiac patients to detect and prevent pressure ulcers and that she had done so as recently as the week before trial.
However, Jones testified that she has not practiced as an intensive-care cardiac nurse. She also testified that she had never provided direct, hands-on care as a staff nurse to patients like Critopoulos, who was in immediate post-recovery in the cardiac-recovery unit. Jones further testified that she had never seen a CABG patient who had just had surgery to implement preventive measures. Additionally, she testified that she had not, as a staff nurse, determined the cardiac stability of a fresh post-CABG patient for the purpose of providing hands-on complete care. She further testified that she had not worked in an ICU setting as a bedside nurse since 1992.
Jones testified that she had reviewed Critopoulos’s medical records, particularly his vital signs, during his time in the cardiac-recovery unit and that she had determined that he was stable enough to turn. On cross-examination, she testified that she had never worked as a staff nurse in a unit dedicated to patients coming directly out of cardiac surgery; that, in her work, she had not gone to the cardiac-recovery unit for the purpose of providing hands-on preventive care for a patient; that she had only gone to the cardiac-recovery unit as educational support for the nurses who worked in the unit; and that, at Duke, the prevention of pressure sores in cardiac recovery was done by the nursing staff based on protocols she had developed. Jones testified that, excluding wound care, she does not provide care to fresh postoperative patients as a staff nurse. Also, on cross-examination, the following occurred:
“[DEFENSE COUNSEL:] Right. And you don’t consider yourself to be an expert on nursing care when it comes to evaluating the cardiac status of a post-CABG patient in recovery, do you?
“[JONES:] I would be able to evaluate their blood pressure, their mean arterial pressure. So some pieces of it, certainly, I can. But the overall, no.
“[DEFENSE COUNSEL:] I asked you on page 120 of your deposition: Tou would not consider yourself to be an expert on nursing when it comes to evaluating cardiac status of a post-CABG patient in recovery; is that correct?’ And what was your answer?
“[JONES:] That it is correct.
*1184 “[DEFENSE COUNSEL:] An unqualified correct; is that right?
“[JONES:] Correct.
“[DEFENSE COUNSEL:] And you’re not qualified to provide continuous hands-on care to a patient in cardiac recovery, are you?
“[JONES:] Not without additional training, no.
“[DEFENSE COUNSEL:] Okay. And you’re not ACLS qualified, are you?
“[JONES:] No.
“[DEFENSE COUNSEL:] What is ACLS?
“[JONES:] Advanced cardiac life support, I believe.
“[DEFENSE COUNSEL:] All right. And that would be something that any nurse working in cardiac recovery would have to be?
“[JONES:] I would certainly hope so.
“[DEFENSE COUNSEL:] All right. And so, you would not be able to provide advanced cardiac life support to a patient in need in cardiac recovery, would you?
“[JONES:] Correct.
“[DEFENSE COUNSEL:] Now, in this case, we have heard terms such as cardiac output, cardiac index, other terms that will be discussed and applicable to patients coming out of cardiac surgery, correct?
“[JONES:] I’m sorry. I haven’t heard testimony about cardiac index or output.
“[DEFENSE COUNSEL:] All right. Well, you said you reviewed the vital signs?
“[JONES:] I did.
“[DEFENSE COUNSEL:] Okay. Let me just — let’s look at some of these. And I believe this, in fact, may be the first page or first set of vital signs when Mr. Critopoulos came out of surgery. See at the bottom it’s April 11th, which was the day he came out of surgery, correct?
“[JONES:] Correct.
[[Image here]]
“[DEFENSE COUNSEL:] And Nurse Janel Ostriechmerer was his nurse; is that right?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] Okay. And Janel would have entered these entries presumably, correct?
“[JONES:] Presumably, yeah.
“[DEFENSE COUNSEL:] Okay. So, coming out of surgery, Mr. Critopoulos had some blood pressures taken. One such pressure was an MAP. What is that?
“[JONES:] Mean arterial pressure.
“[DEFENSE COUNSEL:] Do you know what the nurses were looking for in a number with regard to the MAP with Mr. Critopoulos?
“[JONES:] Specific to Mr. Critopou-los, no.
“[DEFENSE COUNSEL:] Okay. Do you know how that number, MAP here, which is 82, would that be an appropriate mean arterial pressure for Mr. Cri-topoulos coming out of surgery?
“[JONES:] It was my assumption it was, given that his blood pressure was in the normal range.
“[DEFENSE COUNSEL:] All right. So, you’re saying his pressure was in the normal range, right?
“[JONES:] Yes, it’s 126 over — is that 60?
“[DEFENSE COUNSEL:] And so, and the MAP of 82 was appropriate for him?
“[JONES:] As best I understood, yes.
*1185 “[DEFENSE COUNSEL:] And what about the pulse, 112?
“[JONES:] A little high. I didn’t anticipate that was too high coming out of surgery.
“[DEFENSE COUNSEL:] All right. And let’s look at the medicated drips. What medicated drips was Mr. Crito-poulos on at the time?
“[JONES:] He’s on some epinephrine, neosynephrine and nitroglycerin.
“[DEFENSE COUNSEL:] And what are those calculated to do?
“[JONES:] The first two, the epinephrine and neosynephrine, are what’s called vasoactive drugs, which are medications that help to keep the blood pressure in the normal range. And nitroglycerin is — the best way to describe it is for your heart.
“[DEFENSE COUNSEL:] And those are medications that a nurse in cardiac recovery would possibly have to adjust from time to time depending on the changes in blood pressure of the patient?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] Okay. Are you qualified to make those kind of adjustments in those kind of medications for a patient?
“[JONES:] For post-surgical, no, I wouldn’t be qualified for that.
“[DEFENSE COUNSEL:] Okay. All right. And under hemodynamic monitoring, we have cardiac output, 4.1— excuse me, 4.8; is that correct?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] All right. Do you know if that is an appropriate number for Mr. Critopoulos coming out of surgery?
“[JONES:] I do not.
“[DEFENSE COUNSEL:] That’s not something that you monitor?
“[JONES:] No.
“[DEFENSE COUNSEL:] All right. What about the cardiac index of 2.2, do you know if that’s an appropriate number for Mr. Critopoulos coming out of surgery?
“[JONES:] I do not. It’s not something I would monitor.
“[DEFENSE COUNSEL:] Okay. What about the SVR? What is SVR?
“[JONES:] Oh, gosh. That’s making me go back. I don’t remember enough to be able to explain it.
“[DEFENSE COUNSEL:] Okay. How about systemic vascular resistance? Does that sound familiar?
“[JONES:] Could be.
“[DEFENSE COUNSEL:] Okay. And it is 1206. Do you know whether that’s an appropriate number for Mr. Critopoulos?
“[JONES:] I do not.
“[DEFENSE COUNSEL:] Okay. CVP, do you know what that is?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] What’s that?
“[JONES:] Central venous pressure.
“[DEFENSE COUNSEL:] And it is one.
“[JONES:] Uh-huh.
“[DEFENSE COUNSEL:] Do you know if that’s an appropriate number for Mr. Critopoulos?
“[JONES:] Seems a little low, but I don’t know what they were shooting for, for him.
“[DEFENSE COUNSEL:] Okay. So, all of these things that we’ve talked about, blood pressures, the cardiac output, cardiac index, SVR, CVP, medicated drips, all of those things have to be *1186 monitored by the nurses working in cardiac recovery, correct?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] Okay. And they’re watched very closely, aren’t they?
“[JONES:] They are. They should be.
“[DEFENSE COUNSEL:] Because most of the time, the nurses work one to one with the patient or possibly one to two; is that right?
“[JONES:] It’s very typical right after surgery, yes.
“[DEFENSE COUNSEL:] Right. Okay. But this kind of monitoring is not something that you do?
“[JONES:] Not all of it. As I mentioned, I do monitor and look at blood pressure and pulse.
“[DEFENSE COUNSEL:] Okay.
“[JONES:] And oxygen saturation.
“[DEFENSE COUNSEL:] But the other items we discussed, you do not?
“[JONES:] Not typically, no.
“[DEFENSE COUNSEL:] Now, do you typically monitor patients on a balloon pump?
“[JONES:] No.
“[DEFENSE COUNSEL:] And as a direct care provider, you’ve never had to weigh the competing risks of repositioning a post-CABG patient in recovery, have you?
“[JONES:] Post-CABG person, no.
“[DEFENSE COUNSEL:] All right. Now, if tomorrow at Duke University Hospital you were told to report to the cardiac recovery unit of the hospital and begin caring for patients in cardiac recovery on a day-to-day basis, you wouldn’t feel comfortable in doing that, would you?
“[JONES:] No. Not in providing all of their care, no.
“[DEFENSE COUNSEL:] Now, you’ve indicated that sometimes it might not be appropriate to move a patient in cardiac recovery. I think you alluded to that earlier, didn’t you?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] Okay. And I think you’ve indicated that, in your opinion, based on the review of Mr. Critopoulos’s vital signs, some of which were included on the document we just looked at, that you, Nurse Jones, would have no problem in turning Mr. Crito-poulos, correct?
“[JONES:] Correct.
“[DEFENSE COUNSEL:] And that — on a two-hour basis, correct?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] And that was the whole time that he was in recovery?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] All right. And you came to that conclusion by, as you say, reviewing his vital signs, right?
“[JONES:] Reviewing the vital signs and some of the care that was provided, yes.
“[DEFENSE COUNSEL:] Right. And you think it’s important to review the vital signs and [be] able to come to that conclusion that he could be turned, correct?
“[JONES:] Sure.
“[DEFENSE COUNSEL:] All right. And you would certainly expect any nurse to review Mr. Critopoulos’s vital signs before undertaking the task of turning him, correct?
“[JONES:] Yes.
“[DEFENSE COUNSEL:] And it would certainly not be within the appropriate standard of care to turn him with *1187 out evaluating those vital signs, would it?
“[JONES:] Correct.”
Regarding the qualifications of an expert witness, this Court has stated:
“In Medlin v. Crosby, 588 So.2d 1290 (Ala.1991), this Court established a framework under § 6-5-548[, Ala.Code 1975,] for determining whether an expert witness is qualified to testify in a medical malpractice case. Pursuant to Medlin, the trial court must answer the following questions before determining that an expert witness is ‘similarly situated’ as to the defendant:
“ ‘(1) What is the standard of care alleged to have breached? (2) Is the defendant “health care provider” a specialist in the discipline or school of practice of the standard of care that the court has previously determined is alleged to have been breached? (3) Does the proffered expert witness qualify as a “similarly situated health care provider” under the subsection determined in the second step to apply?’
“583 So.2d at 1293.”
HealthTrust, Inc. v. Cantrell, 689 So.2d 822, 826 (Ala.1997).
In this case, the defense presented evidence establishing the fact that Critopou-los was in critical condition after the CABG surgery. The defense also presented evidence indicating that, during the time he was in recovery, Critopoulos had issues with postoperative bleeding and high potassium levels. The defense presented further testimony that Critopoulos was on a ventilator much of the time he was in the cardiac-recovery unit and as to his reaction when he was turned or repositioned. The defense also presented testimony regarding the potential risks of turning or repositioning Critopoulos at certain times. Finally, the defense presented testimony that Critopoulos was at risk of death during some of time he was in the cardiac-recovery unit and that nurses had to prioritize the different risks for such a critically ill patient.
The first question we must answer to determine whether Jones is similarly situated to the individual defendants is what is the standard of care alleged to have been breached in this case. It is true that this case addresses the issue whether Fleming, Rushing, and Ostriechmerer took proper measures to prevent the development of pressure ulcers. However, the overwhelming issue is whether the measures taken by the nurses in this case comported with the standard of care for a post-CABG patient like Critopoulos.
In Dempsey v. Phelps, 700 So.2d 1340 (Ala.1997), Dr. Dempsey, an orthopaedic surgeon, performed surgery to correct a clubfoot on the Phelpses’ son. After the surgery, portions of the son’s foot had to be amputated. On appeal, Dr. Dempsey argued that Dr. Frank Catinella, the Phelpses’ expert witness, was not a “similarly situated health care provider” and that the trial court erred when it allowed Catinella to testify regarding the standard of care. With regard to the standard of care that was alleged to have been breached in that case, this Court stated:
“As to question (1), Dempsey maintains that the standard of care alleged to be breached here is that of an orthopedic surgeon providing care for a child after clubfoot surgery. Dempsey argues that Dr. Catinella, who is a board-certified cardiovascular thoracic surgeon, was not qualified to testify as to this standard of care. However, we agree with the trial court that this case concerned ‘a vascular matter, not an orthopedic matter’— in other words, that the Phelpses’ claims regarded Dr. Dempsey’s alleged failure *1188 to properly treat the child’s foot during the post-surgery phase for the circulatory and vascular problems that developed after the surgery and casting of the foot. These problems are not isolated to this type of surgery, and they do not concern the orthopedic surgery performed by Dr. Dempsey; they concern the treatment of the infection after the surgery that resulted in the loss of his foot. The standard of care allegedly breached was that of a health care provider treating a patient for post-surgical vascular problems and infection, which are not specific to orthopedic surgery.”
700 So.2d at 1344.
Unlike the situation in Phelps, the question whether the nurses in this case took proper measures to prevent Critopoulos from developing pressure ulcei’s is specifically related to their duties in caring for Critopoulos as nurses in the cardiac-recovery unit. The overriding question in this case is whether, in light of Critopoulos’s condition as a post-CABG patient, the nurses took proper measures to prevent the development of pressure ulcers. Therefore, the proper standard of care would be that of a cardiac-recovery nurse treating post-CABG patients to prevent pressure ulcers.
The second question we must ask is is the defendant health-care provider a specialist in the school of practice the Court has determined is alleged to have been breached. With regard to this question, the defense did not present any evidence indicating that Rushing, Fleming, and Ostriechmerer were board-certified specialists. Therefore, we must next answer the third question: whether Jones qualifies as a “similarly situated health care provider” under § 6 — 5—548(b), Ala. Code 1975.[2]
Section 6-5-548(b), provides, pertinent part:
“[A] ‘similarly situated health care provider’ is one who meets all of the following qualifications:
“(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same discipline or school of practice.
“(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.”
(Emphasis added.) Further, this Court has held:
“The Medical Liability Act does not require that the defendant health care provider and the expert witness have identical training, experience, or types of practice, or even the same specialties. To be ‘similarly situated,’ an expert witness must be able to testify about the standard of care alleged to have been breached in the procedure that is involved in the case.”
Rodgers v. Adams, 657 So.2d 838, 842 (Ala.1995).
In this case, Jones was licensed to practice as a nurse in North Carolina. Therefore, she satisfied the requirements of § 6 — 5—548(b)(1), Ala.Code 1975.
*1189 The next question is whether Jones was trained and experienced in the same discipline or school of practice as were Rushing, Fleming, and Ostriechmerer. It is clear that Jones was trained and experienced in the area of wound-care management and pressure-ulcer prevention. Cri-topoulos presented evidence indicating that Jones was generally qualified to testify as to the standard of care for pressure-ulcer prevention. However, her testimony clearly indicates that she was not trained and experienced with regard to the prevention of pressure ulcers for patients in a cardiac-recovery unit, particularly regarding the concerns and/or risks involving fresh post-CABG patients. Jones testified that she had never seen an immediate post-CABG patient for preventive measures; that she had provided hands-on treatment to fresh postoperative patients only for wound care; and that, at Duke, the cardiac-recovery nurses provided pressure-ulcer-prevention care for postoperative patients in the cardiac-recovery unit. Also, her testimony indicated that she was not familiar with the proper values for many of the different status components that were monitored by the nurses in the cardiac-recovery unit. Finally, Jones testified that, as a wound-management specialist, she would perform some of the same clinical services as did a regular cardiac-care nurse, such as checking vital signs, conducting skin assessments, and participating in writing or reviewing care plans. However, she also testified that, without additional training, she was not qualified to provide continuous hands-on care to a post-CABG patient in a cardiac-recovery unit.
Under the unique facts of this case, Jones did not qualify as a “similarly situated health care provider” as defined by § 6 — 5—548(b)(2), Ala.Code 1975. Cf. Jordan v. Brantley, 589 So.2d 680 (Ala.1991) (holding that, in a case involving the mis-identification of bodies by an emergency-room nurse, the plaintiffs expert was not similarly situated because she had not worked in a hospital during the three years before the date of trial and had admitted that she was not an expert in emergency-room procedures).
This Court has previously held that even if an expert witness is not a similarly situated health-care provider, the expert can offer testimony about the standard of care alleged to have been breached if he or she is highly qualified. See HealthTrust, supra; Dowdy v. Lewis, 612 So.2d 1149 (Ala.1992). Critopoulos has established that Jones is highly qualified with regard to general wound-care treatment and the prevention of pressure ulcers. However, he has not shown that Jones was highly qualified with regard to the prevention of pressure ulcers in post-CABG patients who are in a cardiac-recovery unit. Therefore, that exception does not apply in this case.
For these reasons, the trial court exceeded its discretion when it denied the defendants’ motion to exclude Jones’s testimony. Also, the only evidence indicating that Rushing, Fleming, and Ostriechmerer breached the standard of nursing care came from Jones. Therefore, the trial court erred when it did not enter a judgment as a matter of law in favor of the individual defendants. Because Spring-hill’s liability is premised on the liability of the individual defendants, it is also entitled to a judgment as a matter of law in its favor. Accordingly, we reverse the trial court’s judgment and remand the case for the entry of a judgment as a matter of law *1190 for the defendants.[3]
REVERSED AND REMANDED.
MALONE, C.J., and STUART, PARKER, and SHAW, JJ., concur.

. Critopoulos initially included Loretta Beck-ham, Mary Foote, Melody Ernest, and Betty Brinkman as defendants. On January 28, 2009, the parties entered a "Stipulation of Dismissal as to Defendants Loretta Beckham, Melody Ernest, Betty Brinkman, and Mary Foote.” On February 5, 2009, the trial court dismissed Beckham, Ernest, Brinkman, and Foote with prejudice.

. Sections 6-5-548(c) and (e), Ala.Code 1975, include provisions for cases in which the defendant health-care provider is certified by an American board as being a specialist. However, none of the parties contend that the individual defendants in this case were certified as specialists. Therefore, those provisions of § 6-5-548, Ala.Code 1975, do not apply.

. Based on our disposition of this case, we pretermit discussion of the remaining issues raised by the defendants.